UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: 1:24-cv-01383 |
| | ) | |
| $12,204,262.89 UNITED STATES CURRENCY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ONE REAL PROPERTY AT | ) | |
| 10119 HAMILTON HILLS LANE, | ) | |
| FISHERS, INDIANA, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT OF FORFEITURE IN REM

The United States of America, by counsel, Zachary A. Myers, United States Attorney for

the Southern District of Indiana, and Traci M. Cosby, Assistant United States Attorney, files its

Complaint of Forfeiture in Rem pursuant to Supplemental Rules for Admiralty, Maritime and

Asset Forfeiture Claims G(2), and alleges on information and belief as follows:

## NATURE OF THE CLAIM

1.      The United States of America (the "United States") has commenced this action

pursuant to the civil forfeiture provisions of 18 United States Code Section 981(a), seeking

forfeiture of the Defendants based on violations of 18 United States Code Sections 1343, 1347,

1956, and 1957.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 United States Code

Sections 1345 (district courts have original jurisdiction of all civil action commenced by the

United States) and 1355 (district courts have original jurisdiction of any action for forfeiture).

3.      This Court has *in rem* jurisdiction over the Defendants pursuant to 28 United States Code Section 1355(b) (forfeiture can be brought in a district in which any of the acts giving rise to the forfeiture occurred), and Rule G(3)(b)(i) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (clerk must issue a warrant to arrest property in the government's possession).

4.      This Court is the appropriate venue in this matter pursuant to 28 United States Code Section 1395 because the forfeiture accrued in the Southern District of Indiana.

5.      This Court is also the appropriate venue in this matter pursuant to 28 United States Code Section 1395 the Defendants are now, and during the pendency of this action will be, found within the Southern District of Indiana.

## PARTIES

6.      The Plaintiff is the United States of America.

7.      The first Defendant is twelve-million, two-hundred-four thousand, two-hundred-sixty-two dollars and eighty-nine cents in United States Currency ("$12,204,262.89," or "Defendant Currency").

8.      Defendant Currency is derived from the following four financial institutions:

    a.    $1,251,000.00 from Wealthfront, Inc. Account No. 8Wl6FDN3 (Asset Identification Number 23-FBI-006722);

    b.    $4,997,000.00 from Wealthfront, Inc. Account No. 8W14C28M (Asset Identification Number 23-FBI-006721);

    c.    $957,262.00 from Wealthfront, Inc. Account No. 8W13L1HN (Asset Identification Number 23-FBI-006720); and

    d.   $4,999,000.00 from Wealthfront, Inc. Account No. 8W13HDT3 (Asset Identification Number 23-FBI-006719).

9.      Defendant Currency is and will remain in the custody of the United States.

10.     The second Defendant is One Real Property at 10119 Hamilton Hills Lane, Fishers, Indiana ("10119 Hamilton Hills Lane" or "Defendant Acreage 3.50, Section 10, Township 17, Range 4" or "Defendant Real Property"). [Exhibit 1].

11.     The record owner of Defendant Real Property is Richard D. Eaton.

12.     Defendant Real Property has not been seized but is located within the Southern District of Indiana.

13.     The United States requests authority from the Court to seize the Defendant Real Property at this time. Further, the United States intends to promptly take the following steps, consistent with 18 U.S.C. § 985(c)(1):

    a.   Post notice of this action on the Defendant Real Property, and

    b.   Serve notice of this action, along with a copy of this complaint, on the owner of the Defendant Real Property, and on any other person or entity who may claim an interest in the Defendant Real Property.

14.     The Defendant Currency and Defendant Real Property are referred to collectively as "Defendants."

**BACKGROUND**

FACTS RELATED TO MEDS TO YOU, LLC

15.     On March 29, 2019, Bridget Witsken ("Witsken") incorporated SCRIPX INDY, LLC ("SCRIPX"), a domestic limited liability corporation, in the State of Indiana.

16.     SCRIPX's March 29, 2019, Articles of Incorporation listed the principal place of business for SCRIPX INDY, LLC as 8250 Bash Street, Suite A3, Indianapolis, IN, 476250.

17.     SCRIPX's March 29, 2019, Articles of Incorporation identified SCRIPX as a member managed LLC.

18.     SCRIPX's March 29, 2019, Articles of Incorporation identified Incorp Services, Inc. located at 200 Byrd Way, Suite 205, Greenwood, IN, as the business commercial registered agent.

19.     SCRIPX's March 29, 2019, Articles of Incorporation identified Witsken as the President and single member.

20.     SCRIPX's March 29, 2019, Articles of Incorporation listed Witsken's address as 10105 Hamilton Hills Lane, Fishers, IN 46038.

21.     On May 24, 2019, Witsken filed Articles of Amendment, changing the business name for SCRIPX to MEDS TO YOU, LLC ("MTY-IN").

22.     MTY-IN's May 24, 2019, Articles of Amendment did not change the principal place of business for MTY-IN.

23.     MTY-IN's May 24, 2019, Articles of Amendment did not change the member manager for MTY-IN.

24.     On August 17, 2021, CPA Todd W. Parker filed a Business Equity Report on behalf of MTY-IN for years 2021/2022.

25.     MTY-IN's August 21, 2022, Business Equity Report lists the principal place of business for MTY-IN as 10119 Hamilton Hills Lane, Fishers, IN 46038.

26.     On January 13, 2022, Lyman D. Eaton, II ("Eaton") filed Articles of Dissolution for MTY-IN, which became effective January 14, 2022.

27.     On January 14, 2022, Eaton then filed Articles of Revocation of Dissolution, which became effective that same day.

28.     On January 14, 2022, Genesis Ferreiras ("Ferreiras") filed a Change of Governing Person for MTY-IN.

29.      MTY-IN's January 14, 2022, Change of Governing Person changed the managing member of MTY-IN from Witsken to Ferreiras.

30.     MTY-IN's January 14, 2022, Change of Governing Person lists Ferreiras' address as 10660 Eland Street, Boca Raton, Florida, 33428.

31.     On December 27, 2022, Nikolaos Manoudakis ("Manoudakis") filed an Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida listing MTY-IN as the foreign business.

32.     Manoudakis' December 27, 2022, Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida lists Meds to You FL, LLC ("MTY-FL") as the alternate name adopted for the purpose of transacting business in Florida.

33.     MTY-FL's December 27, 2022, Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida lists the principal place of business for MTY-FL as 10119 Hamilton Hills Lane, Fishers, Indiana.

34.     MTY-FL's December 27, 2022, Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida lists the mailing address for MTY-FL as 10660 Eland Street, Boca Raton, Florida 33428.

35.     MTY-FL's December 27, 2022, Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida lists Ferreiras as the owner, Manoudakis as the Florida registered agent, and Cley Nogueira ("Nogueira") as an authorized

person for MTY-FL.

36.     MTY-FL's December 27, 2022, Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida lists Ferreiras' address as 10660 Eland Street, Boca Raton, Florida 33428.

37.     MTY-FL's December 27, 2022, Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida lists Manoudakis' address as 10660 Eland Street, Boca Raton, Florida 33428.

38.     MTY-FL's December 27, 2022, Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida lists Nogueira's address as 8180 Ravenna Lakes Drive, Boynton Beach, Florida 33473.

39.     MTY-FL's December 27, 2022, Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida includes a Certificate of Existence for MTY-IN dated December 19, 2022.

40.     On March 28, 2023, Manoudakis filed a Foreign Limited Liability Company Annual Report for MTY-FL.

41.     MTY-FL's 2023 Foreign Limited Liability Company Annual Report names Ferreiras as the owner, and names Manoudakis and Nogueira as authorized persons.

42.     MTY-IN and MTY-FL (collectively "MTY") maintained a website, which was publicly accessible at https://www.medstoyou.com/.[1]

43.     According to the information that was published on MTY's website, MTY is located at 10119 Hamilton Hills Lane, Fishers, Indiana.

---

[1] The https://www.medstoyou.com/ website has been shut down and is no longer accessible. This site was previously accessed by a special agent from the Federal Bureau of Investigations in conjunction with Case Number 1:23-mj-639-MG. The agent retained copies of the website's pages with the information discussed in this complaint.

44. Also, according to MTY's website, MTY operates during the following hours: "Mon-Fri: 8a.m.-6p.m. | Sat: 8a.m.-1p.m. | Sun: Closed."

45. The "About Us" page on MTY's website identifies Eaton as the only pharmacist under the "Meet Our Pharmacists" heading.

46. Eaton is an Indiana resident.

47. Eaton was a governing agent of MTY until January 14, 2021.

48. According to the Indiana Bureau of Motor Vehicle records, Eaton's home address was 10105 Hamilton Hills Lane, Fishers, Indiana as of July 2023.

<u>FACTS RELATED TO SKYLINE MARKETING SOLUTIONS, LLC</u>

49. On January 27, 2015, Mandoukis filed Articles of Incorporation For Limited Liability Company for Skyline Marketing Solutions, LLC ("Skyline") as a limited liability company in the State of Florida.

50. Skyline's January 27, 2015, Articles of Incorporation list Skyline's principal office address and mailing address as 5341 W. Hillsboro Boulevard, Coconut Creek, Florida 33073.

51. Skyline's January 27, 2015, Articles of Incorporation list Manoudakis as Skyline's registered agent, located at 5341 W. Hillsboro Boulevard, Coconut Creek, Florida 33073.

52. Skyline's 2016 Florida Limited Liability Company Reinstatement and Skyline's 2017, 2018, 2021, 2022, 2023 and 2024 Annual Reports name Manoudakis as the company's Registered Agent and Chief Executive Officer.

53. Skyline's 2017 Annual Report lists 5341 W. Hillsboro Blvd. 306, Coconut Creek, FL 33073 as its principal place of business.

54.     Skyline's 2018 Skyline's Annual Report lists 21367 Chinaberry Drive, Boca Raton, FL 33428 as its principal place of business.

55.     Skyline's 2019, 2020, 2021, 2022, 2023, and 2024 Annual Reports list 10660 Eland Street, Boca Raton, FL 33428 as its principal place of business.

<u>FACTS RELATED TO CLN MARKETING SOLUTIONS, LLC</u>

56.     On November 27, 2017, Nogueira filed Articles of Incorporation For Limited Liability Company in Florida for CLN Marketing, LLC ("CLN").

57.     The November 27, 2017, Articles of Incorporation for CLN lists 9413 Southampton Place, Boca Raton, FL 33434 as its principal place office and mailing address.

58.     CLN's November 27, 2017, Articles of Incorporation name Nogueira as its registered agent, located at 9413 Southampton Place, Boca Raton, FL 33434.

59.     CLN's 2018 and 2019 Annual Reports list CLN's principal place of business as 9413 Southampton Place, Boca Raton, FL 33434.

60.     CLN's 2020, 2021, 2022, and 2023 Annual Reports list 8180 Ravenna Lakes Drive, Boynton Beach, FL 33473 as its principal place of business.

<u>MTY'S MEDICARE PROGRAM ENROLLMENT AND MEDICARE CLAIM SUBMISSIONS</u>

61.     According to the Medicare Provider Enrollment, Chain, and Ownership System (PECOS), MTY is a registered provider with Medicare.

62.     As of August 2023, PECOS listed Ferreiras as the "Authorized Official" and "5% or Greater Direct/Indirect Owner" for MTY.

63.     As of August 2023, PECOS listed Manoudakis as the "Director/Officer," "Contracted Managing Employee," and "Authorized Official" for MTY.

64.     The Medicare Program is a federal health benefit program administered by the Centers for Medicare and Medicaid Services ("CMS").

65.     CMS is an agency of the U.S. Department of Health and Human Services.

66.     Medicare is funded through individual payroll taxes, other taxes, and user fees.

67.     Medicare helps to pay for the reasonable and necessary medical services for people aged 65 and older and some persons under 65 with certain illness and/or disabilities.

68.     Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

69.     Each Medicare beneficiary is identified with a unique beneficiary identifier number ("BIN").

70.     BINs are used, among other ways, to determine a beneficiary's eligibility for Medicare benefits

71.     BINs are also used to submit claims to Medicare seeking reimbursement for items, services, and covered benefits.

72.     Prior to 2015, BINs were composed of either a beneficiary's Social Security Number, or randomly selected numbers and letters.

73.     A BIN is a means of identification because it is a "number that may be used, alone or in conjunction with any other information, to identify a specific individual[.]" 18 U.S.C. § 1028(d)(7).

74.     Since 2015, Congress has mandated that CMS phase out the use of Social Security Numbers.

75.     CMS now assigns Medicare beneficiaries a randomly generated number called a Medicare Beneficiary Identifier ("MBI").

76.     One purpose of the change from BINs to MBIs was to prevent identity theft by strengthening protections for patient identity.

77.     Medicare is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

78.     Medical providers and suppliers must obtain a National Provider Identifier ("NPI") before they enroll in Medicare.

79.     Medical providers and suppliers that seek to become a Medicare provider must submit enrollment documents to Medicare, which includes contact information for the Medicare provider.

80.     Once it was deemed a Medicare provider, MTY was paid by Medicare through the submission of claims.

81.     Every claim that is submitted to the Medicare program by, or on behalf of, a Medicare provider includes an agreement by the provider to abide by Medicare's rules and regulations.

82.     As a condition of payment for claims submitted to the Medicare program, Medicare requires every provider to make the following certifications with each claim submission:

    a.   that all of the information on the claim is true, correct, and complete;

    b.   that the service was personally rendered by the provider or under their direct supervision and incident to the provider's care; and

    c.   that the service was medically necessary for the health and/or well-being of the patient.

83.     All Medicare providers are required to submit claims electronically.

84.     Every claim that MTY submitted to the Medicare program was processed through Madison, Wisconsin.

85.     Claims that are submitted to the Medicare program that originate outside of Wisconsin travel in interstate commerce.

86.     MTY also submitted claims through the Railroad Retirement Board (RRB).

87.     The Railroad Retirement Board is a Medicare program.

88.     The claims for the Railroad Retirement Board are processed through Georgia.

89.     MTY's claims to the Railroad Retirement Board that originated outside of Georgia traveled in interstate commerce.

90.     Payments are made into a provider's bank account through an electronic funds transfer. Providers are required to maintain all documents that substantiate Medicare claims for at least six years.

91.     As of July 24, 2023, and based upon a review of PECOS, MTY is actively enrolled with Medicare. Therefore, at all relevant times, MTY was bound by the laws, rules, and regulations that govern Medicare providers.

<u>MTY'S MEDICARE CLAIMS FOR OTC COVID-19 TEST KITS</u>

92.     In April 2022, the federal government announced that individuals with Medicare could receive up to eight over-the-counter ("OTC") COVID-19 tests per calendar month at no cost to beneficiaries.

93.     Beneficiaries could receive their no-cost OTC COVID-19 test kits from participating pharmacies and health care providers.

94.      Medicare provided these no-cost OTC COVID test kits from April 2022 through the duration of the COVID-19 Public Health Emergency.

95.     The Public Health Emergency ended on May 11, 2023.

96.     When the Public Health Emergency ended, Medicare ceased paying for eight OTC COVID-19 tests per month.

97.     On February 9, 2023, Medicare instituted a one-year grace period for providers to bill OTC COVID-19 tests that were provided to beneficiaries.

98.     Medicare providers were unable to bill for OTC COVID-19 tests supplied after the Public Health Emergency ended prior to the May 11, 2023, deadline.

99.     To receive reimbursement from Medicare for the OTC COVID-19 tests, providers are directed to bill Medicare using Healthcare Common Procedure Code System ("HCPCS") code K1034.

100.    CMS advised Medicare providers billing for these OTC COVID-19 tests to only provide patients with the OTC COVID-19 the tests when the patient requests them.

101.    CMS also advised providers that it could recoup payment from Medicare providers who failed to provide appropriate documentation when requested.

102.    CMS further advised providers that it could take other administrative action for Medicare providers who failed to provide appropriate documentation when requested.

<u>INVESTIGATION INTO MTY MEDICARE CLAIM SUBMISSIONS</u>

103.    MTY represented to Medicare that its practice location was 8250 Bash Street, Suite A3, Indianapolis, Indiana.

104.    MTY provided Medicare with a billing provider address for the OTC COVID-19 tests of 10119 Hamilton Hills Lane, Fishers, Indiana.

105.    Between January 20, 2023, and June 20, 2023, Medicare received approximately 296 beneficiary complaints listing MTY as the subject of the complaint.

106.     Of the 296 complaints that Medicare received between January 20, 2023, and June 20, 2023, listing MTY as the subject of the complaint, 64 of those complaints report that the Medicare beneficiary received no services from MTY.

107.     The Federal Bureau of Investigation ("FBI") and the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG") (collectively "Federal Investigators") investigated allegations that MTY defrauded Medicare by submitting false claims for OTC COVID-19 tests between September 20, 2022, and July 24, 2023.

108.     According to Medicare data, from September 20, 2022, through July 24, 2023, MTY had received approximately $19,046,343.00 in claims reimbursement for OTC COVID-19 test kits allegedly delivered to Medicare beneficiaries.

109.     Between September 20, 2022, through July 24, 2023, MTY submitted claims via interstate wire transmissions for reimbursement through Medicare for OTC COVID-19 tests for patients who never received the OTC COVID-19 tests.

110.     Between September 20, 2022, through July 24, 2023, MTY submitted claims via interstate wire transmissions for reimbursement through Medicare for OTC COVID-19 tests for patients who did not request the OTC COVID-19 tests for which Medicare was billed.

111.     Between September 20, 2022, through July 24, 2023, MTY submitted claims via interstate wire transmissions for reimbursement through Medicare for OTC COVID-19 tests for patients who did not agree to the OTC COVID-19 tests for which Medicare was billed.

112.     Between September 20, 2022, through July 24, 2023, MTY submitted claims via interstate wire transmissions for reimbursement through Medicare for OTC COVID-19 tests for patients who did not approve the OTC COVID-19 tests for which Medicare was billed.

113.    In 2023, Federal Investigators interviewed numerous Medicare beneficiaries who reside in several different states, including the Southern District of Indiana.

114.    None of the beneficiaries who were contacted by the Federal Investigators recalled applying for any OTC COVID-19 tests from MTY.

115.    None of the beneficiaries who were contacted by the Federal Investigators recalled requesting any OTC COVID-19 test kits from MTY.

116.    None of the beneficiaries who were contacted by the Federal Investigators recalled approving for any OTC COVID-19 test kits from MTY.

117.    Some of the beneficiaries who were contacted by the Federal Investigators had received multiple packages containing the OTC COVID-19 tests.

118.    The beneficiaries informed that the unrequested packages that were received for OTC COVID-19 test kits came from an address in Boca Raton, Florida that was unfamiliar to the beneficiaries.

119.    Some of the beneficiaries who were contacted by the Federal Investigators had not received any packages containing the OTC COVID-19 tests.

120.    Between September 20, 2022, through July 24, 2023, MTY submitted claims via interstate wire transmissions for reimbursement through Medicare for OTC COVID-19 tests for patients who were deceased prior to the claim being submitted.

121.    MTY's billing records by Medicare indicate that from December 14, 2022, through July 24, 2023, MTY attempted to bill OTC COVID-19 test kits allegedly ordered by deceased beneficiaries.

122.     MTY's billing records by Medicare indicate that from December 14, 2022, through July 24, 2023, MTY successfully billed for OTC COVID-19 test kits allegedly ordered by deceased beneficiaries.

123.     MTY's billing records by Medicare indicate approximately 27 deceased beneficiaries for whom MTY successfully billed or attempted to bill for OTC COVID-19 test kits.

124.     MTY attempted to bill Medicare approximately $2,544.00 for 27 claims for purportedly supplying OTC COVID-19 test kits after the beneficiary's date of death.

125.     Medicare did pay MTY approximately $376.32 for four (4) claims.

### MTY'S RECEIPT OF FUNDS FROM MEDICARE FOR OTC-COVID-19 TESTS

126.     MTY submitted the claims for the OTC COVID-19 tests for the beneficiaries who were contacted by the Federal Investigators to Medicare for payment.

127.     MTY did not bill Medicare for any HCPCS code between January 14, 2022 and September 19, 2022.

128.     Beginning September 20, 2022, MTY began to exclusively bill Medicare for HCPCS Code K1034.

129.     MTY billed HCPCS Code K1034 for the delivery of OTC COVID-19 tests to all of the beneficiaries who were contacted by the Federal Investigators.

130.     MTY's electronic funds transfer (EFT) agreement within PECOS began on October 6, 2022.

131.     The chart below indicates the totality of MTY's billing for HCPCS Code K1034 that took place from September 2022 through July 24, 2023:

| MTY Claim Submission | | | | | |
|---|---|---|---|---|---|
| Date Range | Claims | Beneficiaries | Total Billed | Total Payments | HCPCS Code |
| 09/2022 through 07/24/2023 | 219,118 | 144,823 | $19,573,200 | $19,046,343 | K1034 |

132.    MTY purchased beneficiary identification numbers for some of the 144,823

beneficiaries for which it submitted claims.

133.    The graphic below indicates the amount Medicare paid MTY for OTC COVID-19

test kits that were allegedly sent to Medicare beneficiaries.



134.    The graphic below indicates the number of Medicare beneficiaries billed for the

OTC COVID-19 test kits that were allegedly shipped to Medicare beneficiaries.



135.     Medicare monies for claim reimbursement by MTY were to be electronically deposited into a checking account at Bank of America Account No. 898129009071.

136.     Bank of America Account No. 898129009071 ("MTY Account") is an account held in the name "Meds to You, LLC."

137.     The MTY Account listed Ferreiras and Manoudakis as the authorized signatories.

138.     The MTY Account was opened on December 1, 2021.

139.     Between on or about January 1, 2022, and June 5, 2023, approximately $19,392,808.15 was deposited into the MTY Account.

140.     As of October 5, 2022, the balance of the MTY Account was approximately $26,324.00.

141.     On October 6, 2022, the MTY Account received its first Medicare payment in the amount of $282.24.

142.     From October 6, 2022, through June 5, 2023, the MTY Account received approximately $19,104,612.36 in Medicare remittances.

143.     The Medicare payments into the MTY Account represents approximately 98.5% of the total deposits received.

144.     The Medicare payments into the MTY Account resulted from MTY's widespread practice of billing Medicare for OTC COVID-19 test kits that were never ordered by and/or never delivered to Medicare beneficiaries.

145.     The monetary transactions in the MTY Account exceeding $10,000 involved the proceeds of the MTY's unlawful acts in violation of Title 18, United States Code, Section 1957.

146.    Between October 6, 2022, and June 5, 2023, there were approximately 917 transactions between $1.00 and $3,000,000.00 of funds moving out of the MTY Account into various other accounts.

147.    Of these 917 transactions out of the MTY Account, 39 transactions were made via wire transfer, check, online banking transfers, and Zelle payments to Bank of America Account No. 898071754199.

148.    Bank of America Account No. 898071754199 ("Skyline Account") was registered in the name of Skyline Marketing Solutions, LLC.

149.    These transactions to the Skyline Account began on October 14, 2022, and totaled approximately $6,704,780.

150.    As of October 13, 2022, the starting balance of the Skyline Account was approximately $388.87.

151.    The inflows from the MTY Account represent 99% of the total inflows of the Skyline Account.

152.    Also, of the total transactions from the MTY Account, there were 41 transactions made via wire transfer, check, online banking transfers, and Zelle payments to Bank of America No. 898090763705.

153.    Bank of America No. 898090763705 ("CLN Account") was registered in the name of CLN Marketing, LLC.

154.    Transactions from the MTY Account into the CLN Account began on October 21, 2022.

155.    Transactions from the MTY Account into the CLN Account continued through approximately May 26, 2023.

156.    Transactions from the MTY Account into the CLN Account totaled approximately $6,731,040.05.

157.    As of October 20, 2022, the balance of the CLN Account was approximately $24,188.79.

158.    The inflows from the MTY Account represent 99% of the total inflows of the CLN Account.

159.    Between March 3, 2023, and April 5, 2023, there were approximately six (6) online banking transfers moving out of the Skyline Account into Bank of America Account No. 898071754186.

160.    Bank of America Account No. 898071754186 ("Skyline Account 2") was registered in the name of Skyline Marketing Solutions, LLC.

161.    The six (6) online transactions from Skyline Account into the Skyline Account2 ranged between $100,000.00 and $700,000.00.

162.    The six (6) online transactions from Skyline Account into the Skyline Account2 totaled approximately $1,375,000.00.

163.    On March 14, 2023, Manoudakis was listed as the account holder for opened Wealthfront, Inc. Account No. 8WI3HDT3.

164.    Wealthfront, Inc. Account No. 8W13HDT3 ("Manadoukis Account") received its first deposit on March 15, 2023.

165.    The first deposit into the Manadoukkis account came from the Skyline Account 2.

166.     Between March 15, 2023 and April 6, 2023, the Mandoukis Account received seven (7) total inflow transactions.

167. All of the inflows into the Manoudakis Account between March 15, 2023, and April 6, 2023 were received from the Skyline Account 2.

168. The total amount of the inflows from the Skyline Account 2 into the Manoudakis Account was approximately $1,375,000.00.

169. Between April 7, 2023, and May 30, 2023, the Manoudakis Account had a total of 12 inflow transactions.

170. Of the 12 inflow transactions into the Manoudakis Account between April 7, 2023, and May 30, 2023, 11 were ACH transactions and one (1) was a wire transfer.

171. All of the inflows into the Manoudakis Account between April 7, 2023, and May 30, 2023, during this time period were received from the Skyline Account.

172. The total value of the 12 inflow transactions into the Manoudakis Account between April 7, 2023 and May 30, 2023, was approximately $3,624,000.00.

173. Wealthfront, LLC Account No. 8W13L1HN was opened on May 30, 2023.

174. The Wealthfront, LLC Account No. 8W13L1HN ("Manoudakis-Ferreiras Account") listed Manoudakis and Ferreiras as the account holders.

175. The first deposit into Manoudakis-Ferreiras Account was received on May 31, 2023 the Skyline Account in the amount of $250,000.

176. The Manoudakis-Ferreiras Account has only ever received four (4) inflow transactions.

177. All of the inflow transactions into the Manoudakis-Ferreiras Account Manoudakis and Ferreiras Account were received from the Skyline Account in the amount of $250,000 for each transaction.

178.    The total transactions into the Manoudakis-Ferreiras Account valued approximately $1,000,000.00.

179.    Wealthfront, Inc. Account No. 8Wl4C28M ("Nogueira Account") was opened on March 14, 2023, with Nogueira listed as the account holder.

180.    The first deposit into Nogueira Account was received on March 15, 2023, from the CLN Account.

181.    Between March 15, 2023, and June 14, 2023, there were 29 total inflow transactions into the Nogueira Account.

182.    All of these inflow transactions into the Nogueira Account were received from the CLN Account.

183.    The value of the inflow transactions into the Nogueira Account were the CLN Account totaled approximately $4,997,000.

184.    On May 26, 2023, Account No. 8Wl6FDN3 was opened at Wealthfront, Inc. listing with Nogueira and Skylar Matthews ("Matthews") as the account holders.

185.    The first deposit into Account No. 8Wl6FDN3 ("Nogueira-Matthews Account") was received on or about May 30, 2023, from the CLN Account.

186.    Between May 30, 2023, and June 5, 2023, there were six (6) total inflow transactions into the Nogueira-Matthews Account.

187.    All of the inflow transactions into the Nogueira-Matthews Account between May 30, 2023, and June 5, 2023, were received from the CLN Account with a total value of approximately $1,251,000.00.

188.    The transfers to and from the MTY, Skyline, CLN, Skyline 2, Manadoukis, Manoudakis-Ferreiras, Nogueira, and Nogueira-Matthews Accounts appear to have no apparent business purpose.

<u>MTY'S USAGE OF 10119 HAMILTON HILLS LANE</u>

189.    The Indiana Pharmacy Board ("IPB") conducts inspections on all registered pharmacies in the state of Indiana.

190.    IPB inspections are generally conducted by a compliance officer every two (2) years.

191.    MTY-IN was inspected on May 17, 2019, at 8250 Bash Street, Suite A3, Indianapolis, Indiana and received a "passing" grade.

192.     MTY-IN was again inspected at 8250 Bash Street, Suite A3, Indianapolis, Indiana on August 19, 2020, and received a "passing" grade.

193.    On August 9, 2023, Federal Investigators investigated MTY's purported practice location at 8250 Bash Street, Suite A3, Indianapolis, Indiana, 46250.

194.    On August 9, 2023, 8250 Bash Street, Indianapolis, Indiana, 46250 was a large, reddish-brown building containing multiple office spaces within the suite marked "A."

195.    On August 9, 2023, 8250 Bash Street Suite "A" contained 11 different office spaces being rented out by various persons/entities.

196.    On August 9, 2023, the directory at the front of the Suite "A" for 8250 Bash Street, listed Suite A3 as being rented by "Sharee Lashes LLC." [Exhibit 2].

197.    A search of the public Indiana Secretary of State website indicated that "Sharee Lashes LLC" was incorporated on July 19, 2019.

198.    A business filing record, filed on July 10, 2021, identified the registered office and address of "Sharee Lashes LLC" as 8250 Bash Street, Suite A3, Castleton, Indiana, 46250.

199.    It does not appear as if MTY has operated or conducted any business from 8250 Bash Street, Suite A3, Indianapolis, Indiana, 46250 since July 19, 2021.

200.    By April 2022, MTY-IN had changes its place of business to 10119 Hamilton Hills Lane, Fishers, Indiana.

201.    Eaton and Richard W. Eaton ("Richard") originally conveyed 10119 Hamilton Hills Lane to the Alberta Eaton Family Trust U/A Dates April 20, 1998 ("Trust") by Personal Representative's Deed on September 5, 2003.

202.    As of April 2022, 10119 Hamilton Hills Lane remained property held by the Trust.

203.    As of April 2022, Eaton and Richard remained co-trustees of the Trust.

204.    10119 Hamilton Hills Lane is a multi-story single family residence in residential neighborhood. [Exhibit 3].

205.    On April 4, 2022, MTY-IN was inspected by an IPB compliance officer at 10119 Hamilton Hills Lane, Fishers, Indiana.

206.    The IPB compliance officer provided the following information related to the April 4, 2022, inspection:

    a.    "During my opening inspection I scrutinized to make sure there were no living quarters within."

    b.    "I have been there two or three times and at NONE of those visits, were there ever staff present."

    c. "As a matter of fact, none had been hired. I was concerned about security, with it only being residential."

    d. "My last discussion was that we wanted to see cameras installed in addition to the existing alarm system."

    e. "The med storage room was basically the former dining room with shelves (on wheels) …and the room had doors (not heavy duty) that [Eaton] said is locked for storage."

    f. "I discussed with [Eaton] that a safe should be installed for CS."

    g. "Per that discussion, [Eaton] was going to bring in a gun safe to utilize."

    h. In the upstairs (form bedrooms) were set up with computers and phones, utilized as a 'call center.'"

207.    MTY-IN received a passing grade for the April 4, 2022, inspection.

208.    On May 25, 2023, Eaton resided at 10105 Hamilton Hills Lane, Fishers, Indiana 46038.

209.    On May 25, 2023, Richard resided at 10200 Willowview Road, Fishers, Indiana 46038.

210.    On May 25, 2023, Eaton and Richard executed a Trustee's Deed conveying 10119 Hamilton Hills Lane from the Trust to Richard D. Eaton for the sum of Ten Dollars ($10.00).

211.    On May 25, 2023, Richard executed a mortgage to Eaton (mortgagee) on 10119 Hamilton Hills Lane ("Mortgage").

212.    The May 25, 2023 Mortgage was executed "in consideration of One Dollar ($1.00) and … and MORTGAGES and WARRANTS to Lyman D. Eaton … the [Defendant Real Property]."

213.     The Mortgage provides, in pertinent part, as follows:

"This Mortgage is given to secure performance by Mortgagor
of the covenants and agreements contained in this Mortgage
and to secure payment of: (i) the principal of and interest on
the indebtedness evidenced by a certain promissory note
("Note"), dated May 24, 2023, executed and delivered by
Richard W. Eaton (hereinafter refe1red to as "Borrower") to
Mortgage in the principal sum of Eighty Thousand Dollars
($80,000.00), with the final payment due on May 15, 2024, and
with interest compounded on the unpaid balance from time to
time at the rate(s) set forth therein, and any other amounts
payable to Mortgagee pursuant to the terms and provisions of
the Note ("Primary Debt") …"

214.     As of May 25, 2023, title of 10119 Hamilton Hills Lane was vested in Richard D.

Eaton; however, the borrower on the Mortgage against 10119 Hamilton Hills Lane is executed as

Richard W. Eaton ("Richard").

215.     On Tuesday July 25, 2023, at approximately 9:15 a.m., the front door of 10119

Hamilton Hills Lane bore a sign that read: "DELIVERIES TAKE TO BACK DOOR THANKS."

[Exhibit 4]

216.     On Tuesday July 25, 2023, at approximately 9:15 a.m., the back door of 10119

Hamilton Hills Lane bore a sign that read: "Meds to You Pharmacy (Closed door Pharmacy, not

open to the public) (Please ring bell)." [Exhibit 5].

217.     On Tuesday July 25, 2023, at approximately 9:15 a.m., the back door of 10119

Hamilton Hills Lane also bore a sign that read: "Out to Lunch I'm probably Next door and can

see You on the doorbell camera ….. I'll come right over." [Exhibit 5].

218.     On Tuesday July 25, 2023, at approximately 9:15 a.m., a federal investigator

conducted surveillance and observed that 10119 Hamilton Hills Lane appeared to be a vacant

residence with no furniture in the rooms on the first floor.

219.    On Tuesday July 25, 2023, at approximately 9:15 a.m., a federal investigator observed that there were no vehicles at or around the property. [Exhibit 3].

220.    On Tuesday July 25, 2023, at approximately 9:15 a.m., a federal investigator observed that 10119 Hamilton Hills Lane did not appear to be an operational pharmacy.

221.    On Tuesday July 25, 2023, at approximately 9:15 a.m., a federal investigator observed that there was no evidence that OTC COVID-19 test kits were being stored at 10119 Hamilton Hills Lane.

222.    On Tuesday July 25, 2023, at approximately 9:15 a.m., a federal investigator observed that there was no evidence that OTC COVID-19 test kits were being shipped from 10119 Hamilton Hills Lane.

223.    On Tuesday July 25, 2023, at approximately 9:15 a.m., a federal investigator observed that there was no evidence that any pharmacy supplies were being stored at 10119 Hamilton Hills Lane.

224.    On Tuesday July 25, 2023, at approximately 9:15 a.m., a federal investigator observed that there was no evidence that any pharmacy supplies were being shipped from 10119 Hamilton Hills Lane.

225.    On August 24, 2023, pursuant to a federally authorized search warrant, Federal Investigators recovered computer equipment from 10119 Hamilton Hills Lane that was used to facilitate MTY's practice of billing Medicare for reimbursement of OTC COVID-19 test kits for Medicare beneficiaries that had neither requested, agreed to, or approved the OTC COVID-19 test kits.

226.    On August 24, 2023, pursuant to a federally authorized search warrant, Federal Investigators recovered documents and marketing materials from 10119 Hamilton Hills Lane

that was used to facilitate MTY's practice of billing Medicare for reimbursement of OTC COVID-19 test kits for Medicare beneficiaries that had neither requested, agreed to, or approved the OTC COVID-19 test kits.

227.    Defendant Real Property was used to facilitate MTY's practice of billing Medicare for reimbursement of OTC COVID-19 test kits for Medicare beneficiaries that had neither requested, agreed to, or approved the OTC COVID-19 test kits.

228.    On August 24, 2023, pursuant to a federally authorized search warrant, Federal Investigators also conducted a search on 10660 Eland Street, Boca Raton, Florida 33428.

229.    On August 24, 2023, pursuant to a federally authorized search warrant, Federal Investigators recovered computer equipment from 10660 Eland Street, Boca Raton, Florida 33428 that was used to facilitate wire fraud, health care fraud, and/or money laundering.

230.    The items recovered from the August 24, 2023, search of 10660 Eland Street, Boca Raton, Florida 33428 were recovered in connection with MTY's practice of billing Medicare for reimbursement of OTC COVID-19 test kits for Medicare beneficiaries that had neither requested, agreed to, or approved the OTC COVID-19 test kits.

<u>PERTINENT STATUTES</u>

231.    Under Title 18, United States Code Section 1343, it shall be unlawful for any person to "devise[] or intend[] to devise any scheme or artifice to defraud," or to "obtain[] money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice[.].

232.    Further, "[i]f the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency … , or affects a financial institution," the person shall be subjected to a fine of "not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. 1343.

233.    Under Title 18, United States Code Section 1343, it shall be unlawful for any person to "devise[] or intend[] to devise any scheme or artifice to defraud," or to "obtain[] money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice[.].

234.    Under Title 18, United States Code Section 1347, it shall be unlawful for any person to "knowingly and willfully execute[], or attempt[] to execute, a scheme … to defraud any health care benefit program; or … to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services."

235.    Additionally, according to 18 United States Code Section 24(b), a health care benefit program to includes "any public or private plan . . . affecting commerce, under which any medical benefit, item or service is provided to any individual, and … any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan[.]"

236.    To commit a violation of health care fraud under 18 United States Code Section 1347, "a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 18 U.S.C. §1347(b).

237.    Also, under Title 42 Section 1320a-7b, it shall be unlawful for any person to "knowingly and willfully purchase[], … or arrange[] for the purchase … or distribution of a beneficiary identification number or unique health identifier for a health care provider under subchapter XVIII …." 42 U.S.C. § 1320a-7b(4).

238.    Title 42 Chapter 7 Subchapter XVIII includes the Medicare Program, making individuals who violate Title 42 Section 1320a-7b subject to criminal penalties.

239.    Under Title 18, United States Code Section 1956, it shall be unlawful for a person to "conduct[] or attempt[] to conduct … a financial transaction which in fact involves the proceeds of specified unlawful activity … with the intent to promote the carrying on of specified unlawful activity; or … knowing that the transaction is designed in whole or in part … to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[,]" while "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity[.]" 18 U.S.C. § 1956(a).

240.    Pursuant to Title 18 United States Code 1956, "the term 'transaction' includes a purchase, … transfer, …or other disposition … by whatever means effected[.]" 18 U.S.C 1956(c)(3).

241.    Also pursuant to Title 18 United States Code 1956, "the term 'financial transaction' means …a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property …." 18

U.S.C. § 1956(c)(4).

242.    Additionally, pursuant to Title 18 United States Code 1956, "the term 'monetary instruments' means (i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery. 18 U.S.C 1956(c)(5).

243.    Moreover, pursuant to Title 18 United States Code 1956, "the term 'specified unlawful activity' means … any act or activity constituting an offense [relating to wire fraud, the laundering of monetary instruments, or engaging in monetary transactions in property derived from specified unlawful activity]." 18 U.S.C. 1956(c)(7)(A).

244.    Under Title 18, United States Code Section 1957, it shall be unlawful for any person to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity … [that] takes place in the United States."

245.    Pursuant to Title 18, United States Code Section 1957, a monetary transaction is any "deposit, withdrawal, transfer, or exchange, in or affecting interstate … commerce, of funds or a monetary instrument … by, through, or to a financial institution … including any transaction that would be a financial transaction …." 18 U.S.C. § 1957(f)(1).

246.    Also pursuant to Title 18, United States Code Section 1957, a monetary instrument is any "coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or … investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery[.]" 18 U.S.C § 1956(c)(5).

247.     Further, under Title 18, United State Code 1957, a financial institution is "any financial institution, as defined in section 5312(a)(2) of title 31, United States Code, or the regulations promulgated thereunder; and … any foreign bank, as defined in section 1 of the International Banking Act of 1978 (12 U.S.C. 3101)[.]" 18 U.S.C. § 1956(c)(6).

248.     Federal Law authorizes the forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 … or any property traceable to such property[.]" 18 U.S.C. § 981 (a)(1)(A).

249.     Title 18 Section 981 further authorizes the forfeiture of "[a]ny property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from a violation of … section 1343 (relating to wire fraud)[.]" 18 U.S.C. § 981 (a)(1)(D)(6).

## CLAIM FOR RELIEF

250.     Pursuant to a federally authorized seizure warrant under Case No. 1:23-mj-00581-KMB, Defendant Currency was seized by the United States on August 4, 2023.

251.     Based on the factual allegation set forth above, Defendant Currency is currency obtained "by means of false or fraudulent pretenses, representations, or promises, transmit[ted] … by means of wire, … in interstate or foreign commerce … for the purpose of executing [a] scheme or artifice[]" to defraud. 18 U.S.C. § 1343.

252.     Additionally, based on the factual allegations set forth above, the Defendant Currency is "money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services" and was "obtain[ed], by means of false or fraudulent pretenses, representations, or promises, … to defraud any health care benefit program[.]" 18 U.S.C. § 1347.

253.     Lastly, based on the factual allegations set forth above, the Defendant Currency is

currency used "in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity … [that] takes place in the United States." 18 U.S.C. § 1957.

254.    Lastly, based on the factual allegations set forth above, the Defendant Currency was derived from the unlawful "purchase[], … or distribution of a beneficiary identification number or unique health identifier for [the Medicare program.]" 42 U.S.C. § 1320a-7b(4).

255.    Based on the factual allegation set forth above, Defendant Real Property was used to facilitate MTY's health care fraud, wire fraud, and money laundering, in addition to the unlawful purchase and/or distribution of beneficiary identification numbers or unique health identifiers for the Medicare program.

256.    Based on the factual allegation set forth above, Defendant Real Property is "property … involved in a transaction or attempted transaction in violation of section 1956, 1957 … or [is] traceable to such property[.]" 18 U.S.C. § 981 (a)(1)(A).

257.    Based on the factual allegation set forth above, Defendant Real Property is also "property, … which represents or is traceable to the gross receipts obtained, directly or indirectly, from a violation of … section 1343 (relating to wire fraud)[.]" 18 U.S.C. § 981 (a)(1)(D)(6).

258.    Based on the facts alleged above, the Defendants are subject to forfeiture under Title 18, United States Code Sections 981, 1343, 1347, 1956, and 1957.

259.    The United States requests authority from the Court to seize the Defendant Property at this time.

260.    Further, the United States intends to promptly take the following steps, consistent with 18 U.S.C. § 985(c)(1):

d. Post notice of this action on the Defendant Real Property, and

e. Serve notice of this action, along with a copy of this complaint, on the owner of the Defendant Real Property, and on any other person or entity who may claim an interest in the Defendant Real Property.

WHEREFORE, the United States prays that the Court authorize the United States' to seize the Defendant Real Property and to promptly take steps, consistent with 18 U.S.C. § 985(c)(1) to effectuate the seizure; that due notice be given to all parties to appear and show cause why the forfeiture of Defendants should not be decreed; that judgment be entered declaring the Defendants be forfeited to the United States for disposition according to law; and that the United States be granted any relief this court deems just and proper.

ZACHARY A. MYERS
United States Attorney

By:       /s/ Traci M. Cosby
          Assistant United States Attorney
          Office of the United States Attorney
          10 W Market St., Suite 2100
          Indianapolis, IN 46204-3048
          Telephone: (317) 226-6333
          Fax: (317) 226-5027
          traci.cosby@usdoj.gov

## VERIFICATION

I, Special Agent Kathryn A. Graham, hereby verify and declare under penalty of perjury that I am a Special Agent for the Federal Bureau of Investigations ("FBI"), that I have read the foregoing Verified Complaint in Rem and know the contents thereof. I further declare that the matters contained in the Complaint are true to my own knowledge, except for those matters stated to be alleged on information and belief, which I believe to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States; information supplied to me by other law enforcement offices; as well as my investigation of this case as a Special Agent with the FBI with other law enforcement officers.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: 7/30/2024

Kathryn A. Graham, Special Agent
Federal Bureau of Investigations